UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| BILLY MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:24-cv-00375-SRC |
| | ) | |
| THE UNITED FOOD & | ) | |
| COMMERCIAL WORKERS | ) | |
| INTERNATIONAL UNION, LOCAL | ) | |
| 655, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum and Order**

Billy Myers used to work as an organizing director for the United Food & Commercial Workers International Union, Local 655.  He doesn't work there anymore, and he submits that Local 655's retaliation and discrimination is to blame.  Myers also contends that Local 655 subjected him to a hostile work environment.  Local 655 rejects these contentions and moves for summary judgment on all of Myers's claims.  Myers also moves for summary judgment on one claim and for leave to amend his complaint.  The Court agrees with Local 655, so the Court grants Local 655's motion and denies Myers's motions.

**I.    Background**

**A.    Factual background**

The Court finds the following facts undisputed for purposes of summary judgment, many of which the parties agree are undisputed.  The Court notes below those facts that the parties do dispute.  To the extent that the parties genuinely dispute facts, the Court views the evidence in the light most favorable to Myers.

David Cook, Local 655's president, hired Myers, who is openly gay and married to an African-American man, as a director of organizing in 2017.  Doc. 44 at ¶¶ 2–4; doc. 51 at ¶ 172. Until around April 2023, Nancy Parker served as Local 655's treasurer.  Doc. 44 at ¶¶ 5, 111–13. Myers alleges that, between October 2021 and April 2023 (when Parker left), Parker harassed him on multiple occasions.

The first alleged incident took place in October 2021.  *Id.* at ¶¶ 15, 98.  Parker was carrying some water bottles into a meeting, and she asked Myers for help.  *Id.* at ¶ 98.  After Myers grabbed some of the bottles from Parker's arms, Parker made fun of Myers to another coworker by saying that it was the first time in over 20 years that Myers had touched a woman's breasts.  *Id.*  Myers told Parker to stop being silly, and he went into Cook's office to find a seat for the meeting.  *Id.*  As Myers sat down, Parker grabbed Myers's face, pulled it into her chest, and started rubbing it into her breasts to the point that Myers could smell Parker's breast sweat. *Id.*  Cook has no recollection of this incident, *see* doc. 41 at ¶ 15, but, for purposes of Local 655's Motion for Summary Judgment, the Court assumes that it happened as Myers alleges.  The parties refer to this alleged event as the "motorboating" incident, so the Court refers to it that way, too.

Eight months later, when Local 655 was planning for a "Pride parade," Myers asked Parker or Cook if a drag queen could ride on Local 655's float.  Doc. 44 at ¶¶ 100–03.  Parker or Cook approved Myers's request, but Myers alleges that Parker made the following statement to Myers:  "Well, you could be the drag queen."  *Id.* at ¶¶ 103–04.  Myers further alleges that, around that same time, Parker called him a "little gay boy,"  *id.* at ¶ 107, and that Parker "constantly" said "f*ck balls" around Myers and other men at work,  *id.* at ¶¶ 109–10.  Myers alleges that, months later, in October 2022, Myers told Parker that he was going to assist Cook's

wife with some home decor, and Parker responded that there would not be any "hanky panky" going on.  *Id.* at ¶ 106.  Local 655 doesn't admit that Parker made these statements, *see* doc. 41 at ¶ 16, but, for purposes of Local 655's Motion for Summary Judgment, the Court assumes that she did.  *See Ferguson v. Cape Girardeau Cnty.*, 88 F.3d 647, 650 (8th Cir. 1996) (holding that, when factual disputes exist at summary judgment, the court must "take all facts and reasonable inferences in the light most favorable to the nonmoving party").

Shortly before October 26, 2022, Myers's position changed from organizing director to organizer, a change that both Myers and Cook both considered to be a demotion.  Doc. 44 at ¶¶ 6, 15, 114.  The Court now recounts the circumstances surrounding the change.  Local 655 staff members had a meeting about "an employee's performance, handling reports, and the possibility of using car-tracking devices."  *Id.* at ¶¶ 89–90.  At some point during the meeting, Cook and other management got up to leave the room, but the employees stayed.  *Id.* at ¶¶ 91–92.  Cook asked Myers to leave along with the other management.  *Id.*  Myers refused, saying, "I'm not part of management . . .  I should be able to, you know, hear what's going on."  *Id.* at ¶ 92.  Cook relented, but, immediately after the exchange, Myers's position changed from organizing director to organizer, and Myers became a FAIR union member.  *Id.* at ¶¶ 92–94.

After that, on October 26, 2022, Myers had a conversation with Cook, and Myers recorded that conversation.  *Id.* at ¶¶ 117, 121.  At one point during the conversation, Myers brought up the motorboating incident, which allegedly took place a year earlier:

> MR. MYERS:  . . . I feel in this local that day by day by day my dignity is being taken away from this Local.  You sat here in this chair with [Parker] who motor boated me in front of you.  I'm a gay man and nothing was said, and I'm sitting there like—
>
> MR. COOK:  What are you talking about?
>
> MR. MYERS:  When [Parker] put her [breasts] in my face and did this.

      MR. COOK:  I don't even recall that.

      MR. MYERS:  We were sitting right here.

      MR. COOK:  I'm not saying it didn't happen[.] I don't recall it, Billy.

Doc. 44-1, David Cook Depo. Tr. at 33:6–33:18.  This was the first time that Cook recalled

hearing about the motorboating allegation.  Doc. 44 at ¶ 122.  During the conversation, Myers

also questioned the basis for his change of position:

      MR. MYERS:  And what did I do wrong as a Director, I don't know.  The
only thing I did wrong, when I've heard it here, when I used the F word with
Tara.  Lakinia, she respects me.  I mean hell, we had conversations once a week.
My staff respects me.  They say I'm a good Director.  They say I'm fair.  They
say I'm understanding.  So I don't understand where am I dropping the ball?  I
mean we've organized more than you guys have in the last 20 year, so I don't
understand where am I dropping the ball.  I'm doing what I'm supposed to do.
Do I go in there and manhandle the employees, no, I don't do that, that's not my
style, but will I work with them side-by-side and help them grow, absolutely.
That's my job.  So I don't understand where you're saying I'm not a good
Director?  I've been a Director—I mean I've been in management for 15 years
now.  No one has ever had a problem with me.  I just don't understand it.  Is it
because of my dementia and when I was upset and I was going through my
mental stage?  I don't know.  Is it because that I called her out on the floor about
sexually harassing me, could be, I don't know.  I don't know what I did.

      MR. COOK:  I will say again, my concerns with your performance as a
Director, I want to be clear—

      MR. MYERS:  But you didn't tell me what I did wrong, you just said that.
Give me some examples, I don't know what you're talking about.

Doc. 44-1, Cook Depo. Tr. at 20:10–21:13; *see also* doc. 44 at ¶¶ 7, 119–20.

    Five days later, Myers received a written warning, which indicated that Myers had

committed "improper conduct" by making statements about other staff members.  Doc. 44 at

¶¶ 95, 131; *see also* doc. 36-11.  According to the written warning, Cook received notice that

Myers "intentionally spread misinformation to the staff in order to be disruptive."  Doc. 36-11 at

1.[1]  The warning enumerated seven "unacceptable comments" that Myers allegedly made, in the workplace, about his co-workers.  *Id.*  Myers signed the warning with the comment "Did not happen," referring to his belief that Cook's version of events did not happen.  *Id.* at 2; *see also* doc. 44 at ¶ 97.  From that point on, Myers faced no discipline until his termination.  Doc. 44 at ¶ 10.

Fast forward to April 2023.  Parker told Myers that she was "out of here," and Myers asked her if she was retiring.  *Id.* at ¶ 112.  According to Myers, Parker responded that she still had a couple of days "to flip" Myers.  *Id.* at ¶ 113.  But eventually—and before Myers's termination—Parker did retire.  *Id.* at ¶ 111.

Two months later, Myers's relationship with Local 655 got worse.  David Down, an employee at a local cannabis dispensary who has never had any affiliation with Local 655, expressed interest in exploring unionizing efforts with Local 655.  *Id.* at ¶¶ 16, 19–21.  Down got in touch with Myers, whom Down had never met before.  *Id.* at ¶¶ 21–22.  After a dinner meeting, Down set up another gathering at a venue called the HandleBar.  *Id.* at ¶¶ 23–26.  Myers told Down to invite several of his coworkers and their guests to attend the event to discuss the possibility of organizing.  *Id.* at ¶ 27.  Down brought his wife, and many of Down's co-workers also brought their spouses, significant others, and other guests to the event.  *Id.* at ¶¶ 29–30.  Myers brought his husband along, *id.* at ¶ 31, but no other Local 655 representatives attended, *id.* at ¶ 63.

The parties dispute exactly how Myers behaved at the HandleBar event, so the Court describes, in this paragraph, what Myers admits.  Myers admits that, while he had only two drinks, he felt woozy, dizzy, and nauseous.  *Id.* at ¶¶ 66, 80.  Myers admits that he referred to one

---

[1] The Court cites to page numbers as assigned by CM/ECF.

of the dispensary's attending employees as a "beautiful black queen," at least once, and maybe multiple times. *Id.* at ¶ 76. Myers also admits that he discussed another employee's satanic religion and noted, to that employee, that the "media and people" accuse satanists of "kidnap[ping] kids and so on," although he alleges that he also stated, "I know that's not true." *Id.* at ¶¶ 77–78. Finally, Myers admits that he showed Ms. Down what "motorboating" meant by, in front of Ms. Down, "acting out" what he alleges Parker did to him in the October 2021 incident. *Id.* at ¶ 75. But Myers denies that he made physical contact with Ms. Down or used a racial slur. *Id.* at ¶¶ 75, 79.

Cook and Down tell a different story. According to Cook, Myers told Cook that he had really screwed up at the HandleBar event and had used a racial slur, the "n word." *Id.* at ¶ 138. And according to the Downs, Myers shoved his face into Ms. Down's breasts and "motorboated" Ms. Down by making the sound of a motorboat with his lips while moving his head from side to side. *Id.* at ¶ 37.

But Myers *does* admit that Down emailed another Local 655 organizer to complain about Myers's behavior at the HandleBar event. *Id.* at ¶ 44. The email said:

> Sean,
>
> Because of a series of unfortunate behaviors displayed by [Myers] during our informational gathering at HandleBar on Friday, my coworkers and I are requesting a new organizer. I'm not sure if you are available to take on our group, but I think it would potentially save our hopes of ever becoming unionized. [Myers] became very intoxicated and used inappropriate and borderline racist language, put his face in my wife's chest, discussed cocaine use and made my team lead uncomfortable while discussing religious beliefs and asking pressing questions about her religion.
>
> This is difficult for me to send, because we had/still have a lot of hope that we will one day become unionized. But if we ever stand a chance of getting more of my coworkers to join our cause, we will need to move forward with a different organizer.
>
> Thank you for your understanding and help,

6

David Down

Doc. 36-6; *see also* doc. 44 at ¶ 45.  In a later email to that other organizer, Down further

clarified his recollection of what happened:

> On the evening of Friday, June 9th 2023, [Myers] and I had arranged an after work
> get together for my coworkers and I at HandleBar on Manchester in St. Louis.  My
> wife and I arrived around 18:00 along with some of my coworkers Ian and Kenna.
> [Myers] arrived around 18:30, after introducing himself as a union organizer for
> UFCW Local 655 he proceeded to get extremely intoxicated.  At some point my
> wife was trying to fix [Myers's] hair and [Myers] stuck his face into my wife's
> breast.  He questioned Kenna about her religious beliefs, asking if she "kidnaps and
> eats babies."  When the rest of my coworkers, Myah and Kaitlyn, arrived he told a
> story about crashing a vehicle while under the influence of cocaine.  He repeatedly
> referred to Myah as his "black queen". [sic]  All of this made me feel extremely
> uncomfortable as it progressed.  My wife and I left the bar around 22:30 so this is
> the extent of the things I witnessed.  I felt extremely embarrassed, disrespected, and
> as though my chances of unionizing were placed in jeopardy.

Doc. 36-7; *see also* doc. 44 at ¶ 46.

When Cook caught wind of Down's complaint, Cook met with Myers and presented

Myers with a corrective action that notified him of his termination.  Doc. 44 at ¶ 85; *see also* doc.

36-9.

## B.    Procedural background

Two months after his termination, Myers filed a charge of discrimination with the

Missouri Commission on Human Rights and the EEOC.  Doc. 44 at ¶ 11; *see also* doc. 36-3.

Three months after that, the EEOC gave Myers a dismissal and a notice of right to sue.  Doc. 44

at ¶ 13.  Myers sued Local 655 in state court three months later.  *See* doc. 4.  In his complaint,

Myers alleged that Local 655 violated Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§§ 2000e et seq., in three ways:  (1) retaliation, (2) hostile work environment, and (3)

discrimination on the basis of sex.  *See* doc. 4.

In March 2024, Local 655 removed the case to this Court.  Doc. 1.  Now, three motions pend before the Court.  First, Myers moves for partial summary judgment on his retaliation claim.  Doc. 32.  Second, Local 655 moves for summary judgment on all claims.  Doc. 35. Third, Myers moves for leave to amend his complaint to allege that he satisfied a more stringent causation standard than he had originally alleged that he satisfied.  Doc. 38.  The parties have fully briefed these motions, *see* docs. 33–34, 36–37, 39–47, 50–51, and the motions now await this Court's review.

## II.    Standard

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts.  *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(a).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party

who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    Discussion

### A.    Retaliation claims

Myers alleges two instances of retaliation:  (1) his demotion from organizing director to organizer and (2) his termination. *See* doc. 4 at ¶¶ 16, 27–35; *see also* doc. 33 at 2 n.1 (explaining that the complaint "contemplates" two instances of retaliation).  To be sure, in portions of the summary-judgment briefing, Myers appears to argue that the October 2022 written warning amounts to retaliation under Title VII. *See, e.g.*, doc. 33 at 8 (arguing that the evidence shows that Cook "was motivated to discipline [Myers] for making protected complaints of sexual harassment" both by issuing Myers the written warning and by terminating Myers).  But the complaint makes no mention of the written warning. *See generally* doc. 4.  A plaintiff may not amend his complaint in a summary-judgment brief. *See Thomas v. United Steelworkers Local 1938*, 743 F.3d 1134, 1140 (8th Cir. 2014) (collecting cases).  Thus, the Court considers only the two instances of retaliation alleged in the complaint.

Local 655 moves for summary judgment on both the demotion and termination counts. Doc. 35 at 1; doc. 37 at 3–9.  Myers moves for summary judgment on only the termination count. Doc. 32 at 1–2; doc. 33 at 2 n.1, 7–11.  After enumerating the Title VII retaliation standard, the Court will address the counts individually.

"Title VII 'prevents employers from retaliating against employees who have acted to vindicate their statutorily protected rights by reporting harassment or discrimination in the workplace.'" *Warren v. Kemp*, 79 F.4th 967, 972 (8th Cir. 2023) (quoting *Brannum v. Mo. Dep't*

of Corrs., 518 F.3d 542, 547 (8th Cir. 2008)).  "To establish retaliation under . . . Title VII . . . a plaintiff must prove (1) he engaged in a statutorily protected activity, (2) suffered an adverse employment action, and (3) that the engagement in a protected activity is the but-for cause of the adverse employment action."  Id. at 973 (citations omitted).

After establishing an adverse employment action, to survive an employer's motion for summary judgment, a plaintiff "either must offer direct evidence of retaliation or create an inference of retaliation under the" burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Sellars v. CRST Expedited, Inc., 13 F.4th 681, 692 (8th Cir. 2021) (quoting Hutton v. Maynard, 812 F.3d 679, 683 (8th Cir. 2016).  Direct evidence of retaliation is "evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the harmful adverse action was in retaliation for the protected conduct."  Id. (quoting Young-Losee v. Graphic Packaging Int'l, Inc., 631 F.3d 909, 912 (8th Cir. 2011)).  To create an inference of retaliation under the McDonnell Douglas burden-shifting framework, a plaintiff has the initial burden of showing that he "engaged in statutorily protected conduct," "suffered an adverse employment action," and "a causal connection exists between the two."  Id. at 694 (quoting Hutton, 812 F.3d at 685).  Then, the burden shifts to the employer to offer legitimate, non-retaliatory reasons for the alleged retaliatory action before the burden shifts back to the plaintiff to show that those reasons were pretext for retaliation.  Id. (citation omitted).

### 1.    Demotion from organizing director to director

As to his demotion, Myers argues that he has offered direct evidence of retaliation because Cook:  (1) issued the written warning for Myers's allegedly "disruptive" conduct five days after the sexual-harassment complaint (even though, Myers says, Cook later admitted that

Myers's complaint about sexual harassment amounted to "disruptive" conduct) and (2) remained silent when Myers asked Cook if the sexual-harassment complaint caused the demotion.  Doc. 43 at 1–2.  The Court disagrees with Myers's reasoning.

The sexual-harassment complaint *couldn't* have caused the demotion because the demotion occurred *before* the complaint.  *See* doc. 44 at ¶ 6 (admitting that Myers's position changed "prior to October 26, 2022"); *id.* at ¶ 121 (admitting that Myers complained to Cook on October 26, 2022).  "[A]lleged retaliation [that] precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event."  *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1044 (8th Cir. 2007).  Thus, the Court need not consider further—under the direct-evidence standard or under the *McDonnell Douglas* burden-shifting framework—whether the demotion was retaliation for the sexual-harassment complaint.  *See id.* (declining to "examine[] for causation" protected conduct that preceded the alleged retaliation).

Myers points to no other instances of protected conduct that could have caused the demotion.  Indeed, Myers fails to controvert Local 655's evidence that October 26, 2022, was the first time that Cook recalls hearing about the sexual-harassment allegation.  *See* doc. 44 at ¶ 122; *see also* E.D. Mo. L.R. 4.01(E) (providing that "[a]ll matters set forth in the moving party's Statement of Uncontroverted Material Facts shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party").  And Myers never blames anyone other than Cook for the demotion.  *See generally* doc. 43.

Because Myers cannot show retaliation with direct evidence or under the *McDonnell Douglas* framework, Myers's claim of retaliation cannot survive summary judgment.  *See*

*Sellars*, 13 F.4th at 692.  Accordingly, the Court grants Local 655's Motion for Summary Judgment, doc. 35, as to Myers's demotion.

### 2.    Termination

Local 655 doesn't dispute that Myers engaged in statutorily protected conduct when he complained of sexual harassment.  *See* doc. 42.  Nor does Local 655 dispute that Myers suffered an adverse employment action when the union terminated him.  *See id.*  But Local 655 does dispute causation:  whether Local 655 terminated Myers because of his sexual-harassment complaint, or whether it terminated him for legitimate, nonretaliatory reasons.  *See generally* docs. 33, 37, 42, 43.  The Court analyzes causation under both the direct-evidence standard and the *McDonnell Douglas* framework.

### a.    Direct-evidence standard

Once again, Myers argues that direct evidence of retaliation exists.  *See* doc. 33 at 7–8. Once again, Myers points to the written warning, which Cook purportedly issued for "disruptive" conduct, and to Cook's response to Myers's question about whether Myers's sexual-harassment complaint caused the demotion.  *See id.*  Once again, the Court disagrees that Myers has offered direct evidence of retaliation.

First, the evidence that Myers cites doesn't even show a specific link between the sexual-harassment complaint and the *demotion* or *written warning*, let alone the *termination*. The Court discussed the demotion above.  *See supra* § III.A.1.  And Myers admits that the written warning listed seven instances of disruptive conduct, none of which even mentioned Parker or otherwise related to the sexual-harassment complaint.  *See* doc. 44 at ¶¶ 130–31. While Myers disputes that the listed instances truly caused Cook to issue the written warning,

*see, e.g.*, doc. 44 at ¶ 129, that dispute, even if genuine, doesn't show a "specific link" between the sexual-harassment complaint and the written warning.  *Sellars*, 13 F.4th at 692.

Cook's statement that he would have found a false accusation of sexual harassment disruptive—which he made a year and a half after Myers's termination, *see* doc. 44-1, David Cook Depo. Tr. at 53:11–53:18—does not provide direct evidence of retaliation.  *See Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 804 (8th Cir. 2019) (holding that "statements by decisionmakers unrelated to the decisional process are not direct evidence" (quoting *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 902 (8th Cir. 2015))).

Cook's supposed silence in response to Myers's question about whether the demotion was retaliatory, *see* doc. 43 at 4, lacks probative value, too, for two reasons.  First, Myers asked Cook about the reason for the demotion, not about the reason for the written warning, *see* doc. 44-1, David Cook Depo. Tr. at 20:9–21:14, and Myers fails to produce any evidence that the demotion and the written warning were in any way related to each other, *see generally* doc. 44.  Thus, Cook's response doesn't provide direct evidence of retaliation because the response was "unrelated to the decisional process."  *Mahler*, 931 F.3d at 804.  Second, even in the light most favorable to Myers, *see AgriStor*, 826 F.2d at 734, Cook's response does not suggest that Myers's sexual-harassment complaint motivated any adverse employment action.  The transcript shows that Myers posed to Cook an uninterrupted series of questions and accusations about Myers's change in position, and that before Cook could even finish a single complete sentence in response, Myers interrupted him with contradictions and demands to give examples in support of the change.  *See* doc. 44-1, David Cook Depo. Tr. at 20:9–21:14.  It would simply be unreasonable to construe Cook's partial answer as evidence of retaliation.  *See id.*

To conclude that the sexual-harassment complaint caused the written warning, the Court would need to make a series of inferences: (1) Cook *was* being genuine when he stated that he issued Myers the written warning for "disruptive" conduct; and (2) at the same time, Cook was *not* being genuine when he stated that he issued Myers the written warning for the specifically enumerated instances of disruptive conduct, which means either that (a) Cook wasn't actually informed of those instances of disruptive conduct; or, (b) Cook *was* informed of those instances, but he didn't believe that they had actually occurred or didn't believe that they amounted to disruptions; or, (c) even if Cook was informed of the instances, believed that they occurred, and believed that they were disruptive, he wouldn't have issued the written warning just because of those instances. Myers has produced no evidence to support any of these inferences, so the record does not contain direct evidence of retaliation. *See Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153 (8th Cir. 2007) (declining to hold that direct evidence of discrimination existed, in part because "an inference [was] required to connect" the purported evidence to the allegedly discriminatory act); *see also Mahler*, 931 F.3d at 805 (applying *Ramlet*'s direct-evidence reasoning to a Title VII retaliation case).

Even less has Myers shown a specific link between the sexual-harassment complaint and the adverse employment action at issue—Myers's termination—which occurred nearly *eight months* after Myers made the sexual-harassment complaint and Cook issued the written warning. *See* doc. 44 at ¶¶ 121–22 (admitting that Myers complained about sexual harassment on October 26, 2022); *id.* at ¶ 95 (admitting that Myers received the written warning on October 31, 2022); *id.* at ¶ 85 (admitting that Myers was terminated on June 14, 2023). Thus, to conclude that the sexual-harassment complaint caused Myers's termination, the Court would need to rely on not only the series of inferences in the preceding paragraph but also on another unsupported

14

inference:  that Cook decided *not* to retaliate against Myers at first, *see id.* at ¶ 133 (admitting that Myers faced no discipline of any kind from October 2022 through June 2023), but then decided to terminate him for the sexual-harassment complaint eight months later.

In an attempt to skirt around this unfavorable timeline, Myers makes three arguments. *See* doc. 43 at 7.  First, Myers argues that his theory doesn't rely on temporal proximity because he's produced evidence of animus.  *See id.*  Second, Myers argues that he was complaining about sexual assault at the HandleBar event and that this complaint relates to "the reasons [Local 655] now tries to assert for termination."  *Id.*; *see also* doc. 44 at ¶ 137.  Third, Myers argues that Cook *might* have heard protected complaints from Myers closer to the termination date.  Doc. 43 at 7.

The first argument doesn't support a finding of direct evidence.  As explained above, Myers has *not* produced direct evidence of animus.

The second argument fails too.  While Myers disputes the allegations in Down's complaint, Myers admits that Local 655 received Down's complaint and that Down's complaint alleged that Myers stuck his face into Ms. Down's breasts, which made Down feel embarrassed and disrespected and which induced Down to tell Local 655 that his co-workers would not want to move forward with unionizing if Myers continued to serve as their organizer.  *See* doc. 44 at ¶¶ 44–47.  That *Myers* alleges that he was re-telling his own story as a victim of sexual harassment when he demonstrated the act of "motorboating" at the event, even if true, doesn't change that Local 655 was notified of Myers's alleged behavior (and the discomfort that that alleged behavior caused prospective union members) and that Myers *admits* that he demonstrated "motorboating."  *See id.* at ¶¶ 44–47, 75.  And perhaps most importantly, Myers's demonstration of "motorboating," even under Myers's own version of events, doesn't qualify as protected

activity under Title VII.  To engage in protected activity, an employee must either:  (a) make a charge, testify, assist, or participate in a Title VII investigation, proceeding, or hearing, or (b) "oppose[]" an employment practice made unlawful by Title VII.  *See* 42 U.S.C. § 2000e-3(a). The first category plainly doesn't apply here.  And Myers's demonstration doesn't qualify as opposition to an unlawful employment practice.  Myers wasn't "oppos[ing]" sexual harassment by demonstrating that very same alleged sexual harassment to someone who had no power to rectify the unlawful employment practice.  *See Oppose*, The Random House Dictionary of the English Language, at 1010 (1st unabridged ed. 1966) (defining "oppose," in relevant part, as "to act against or provide forceful resistance to; combat"); *see also* doc. 44 at ¶ 63 (admitting that Myers was the only Local 655 representative at the HandleBar event).

The third argument fails, too.  Cook's statement that it is theoretically *possible* that he had heard other complaints and just didn't remember them during his deposition, *see* doc. 43 at 7 (citing doc. 44 at ¶ 164), does not provide direct evidence of retaliation.  Even if the Court assumes that this theoretical possibility equals reality (which itself requires a substantial inferential leap), the Court would still need to make at least two more inferences:  (1) that Cook still remembered the complaints at the time of the termination and (2) that those complaints induced the termination.  *See Ramlet*, 507 F.3d at 1153; *see also Mahler*, 931 F.3d at 805.

In sum, Myers does not offer any direct evidence of retaliation.

### b.    *McDonnell Douglas* **framework**

Because a plaintiff needs to satisfy only a "minimal" burden to establish a prima facie case of retaliation, *see Mahler*, 931 F.3d at 805, the Court assumes that Myers has satisfied the burden.  Thus, the Court assesses whether Local 655 has articulated a legitimate, nondiscriminatory justification and, if so, whether Myers can prove pretext.

16

To satisfy its burden, "the employer need only produce admissible evidence [that] would allow the trier of fact rationally to conclude that" retaliation had not motivated the employment decision. *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 257 (1981). This step requires the employer to satisfy a burden of *production*—not a burden of *persuasion*. *See id.* at 257–58.

Here, with undisputed evidence, Local 655 more than carries its burden of production. Myers admits that, after the HandleBar event, Down emailed Local 655 and said that his employees were still interested in unionizing, but they were unwilling to work with Myers because Myers "became very intoxicated and used inappropriate and borderline racist language, put his face in [Ms. Down]'s chest, discuss[ed] cocaine use and made [Down's] team lead uncomfortable while discussing religious beliefs and asking pressing questions about her religion." Doc. 44 at ¶¶ 9, 45, 137. And Myers further fails to controvert Local 655's evidence that Myers's actions at the HandleBar event offended Down. *Id.* at ¶ 39. Finally, Myers admits that the corrective action described, as the basis for the termination, Down's report of Myers's behavior at the HandleBar event. *Id.* at ¶ 85.

To be sure, and as the Court describes in the factual background, *see supra*, Myers *does* dispute some of the underlying facts about his behavior that gave rise to Down's complaint. But that doesn't undermine the evidence of misconduct that Myers admits that Local 655 received from a by-all-appearances disinterested third-party witness. *See* doc. 44 at ¶¶ 16, 22–24 (admitting that Mr. and Ms. Down had never had any affiliation with Local 655 and had never met Myers until late May or early June 2023). Nor does it mean that Local 655 has failed to satisfy its burden of production. *See Richey v. City of Indep.*, 540 F.3d 779, 784 (8th Cir. 2008) ("If the employer takes an adverse action based on a good[-]faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not

because of protected status or activity."); *see also King v. Guardian ad Litem Bd.*, 39 F.4th 979, 986 (citing *Richey* approvingly in a Title VII retaliation case).

Thus, the Court addresses whether Myers has demonstrated a material question of fact as to pretext. "There are at least two routes for demonstrating a material question of fact as to pretext: first, a plaintiff may succeed indirectly by showing [that] the proffered explanation has no basis in fact; or, second, a plaintiff can directly persuade the court that a prohibited reason more likely motivated the employer." *Gibson v. Geithner*, 776 F.3d 536, 540 (8th Cir. 2015) (citing *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 854 (8th Cir. 2012)). Proof of pretext requires more substantial evidence than it takes to make a prima facie case of discrimination because the Court will view evidence of pretext in light of the employer's justification. *Id.*

Here, Myers's argument for pretext goes like this. First, "[t]he uncontroverted facts establish that [Myers] was terminated for one reason and one reason alone: that he allegedly admitted to using the 'N word.'" Doc. 43 at 5 (emphasis removed) (citing doc. 44 at ¶ 170). Second, Cook failed to investigate the context of Myers's use of the "N word." *Id.* (citing doc. 44 at ¶¶ 171–72). Third, Myers has an African-American husband, and Cook admitted that Myers is not racist. *Id.* (citing doc. 44 at ¶ 171). Fourth, therefore, Cook could not have concluded that Myers used the "N word" with malicious or discriminatory intent. *Id.*

Myers's argument misses the point. Local 655 didn't terminate Myers because he was racist or because he acted maliciously but because Local 655 received a report that Myers had acted so unprofessionally and offensively at the HandleBar event that the prospective union members, without solicitation, told Local 655 very fact-specific reasons that they did not want to work with Myers again. *See* doc. 36-9; *see also* doc. 44 at ¶ 85. So Myers's argument doesn't move the needle. Assume that Myers used the "N word" in a non-malicious or non-racist

18

context (assuming, solely for the purpose of giving Myers the benefit of the doubt, that such a context exists), or that Myers didn't use the "N word" at all. Assume further that Myers is not a racist. That wouldn't change what Myers has admitted—that Myers's behavior toward Ms. Down and his language about race offended Down and his team so much that Down complained about it to Local 655 without solicitation. *See* doc. 44 at ¶¶ 39, 44–45. Nor would it change that Myers admits that he, at a work function, both demonstrated an act that he considered to be sexual harassment and used racial language in front of prospective union members. *See id.* at ¶ 75 (admitting that Myers, in front of Ms. Down, "demonstrate[ed] what was done to him when he was sexually harassed by Nancy Parker, by acting out what was done to him"); *id.* at ¶ 76 (admitting that Myers referred to one of the prospective union members, perhaps more than once, as a "beautiful black queen").

In sum, Myers has failed to demonstrate a material question of fact as to pretext. Far from showing that the proffered explanation has no basis in fact, *see Gibson*, 776 F.3d at 540, Myers admits the facts that demonstrate a nonretaliatory basis for Myers's termination. And considering all this undisputed evidence, the Court remains unpersuaded that a prohibited reason more likely motivated Local 655 to terminate Myers than the reason that Local 655 has proffered. *See id.* Thus, as to count 1, the Court grants Local 655's Motion for Summary Judgment, doc. 35, and denies Myers's Motion for Summary Judgment, doc. 32.

The Court has thoroughly considered Myers's proposed amended complaint and evaluated whether it states a claim for relief. The Court finds that it does not. The Court further evaluated whether Myers's retaliation claim could survive summary judgment even if Myers had alleged but-for causation in the complaint, and the Court finds that it could not. The Court accordingly finds that it would be futile to allow Myers to amend his complaint and denies

Myers's Motion to Correct or Amend, doc. 38. *See Bauchman for Bauchman v. West High Sch.*, 132 F.3d 542, 562 (10th Cir. 1997) ("A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment." (citations omitted)).

### B.    Hostile-work-environment claim

Local 655 moves for summary judgment on Myers's hostile-work-environment claim. *See* docs. 36–37. Local 655 argues that any claim based on the "motorboating" incident is time-barred and that, in any event, Myers's allegations don't establish sufficiently severe or pervasive harassment. *See* doc. 37 at 10–14. The Court need not reach the timeliness issue because the Court agrees that Myers's allegations, while disturbing, don't support a hostile-work-environment claim under Eighth Circuit precedent.

To prevail on his hostile-work-environment claim based on alleged sexual harassment, a plaintiff must establish that he suffered harassment "sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Meinen v. Bi-State Dev. Agency*, 101 F.4th 947, 951 (8th Cir. 2024) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). *Meinen* provides helpful insight into what amounts to a hostile work environment, as does *Anderson v. Family Dollar Stores of Arkansas, Inc.*, 579 F.3d 858 (8th Cir. 2009), a case that *Meinen* cited, *Meinen*, 101 F.4th at 952.

In *Meinen*, the Eighth Circuit affirmed the dismissal of a hostile-work-environment claim as insufficiently severe or pervasive. *Id.* at 951–52. The employee had alleged that a co-worker of a different race "intentionally rubbed her backside on him" on several occasions. *Id.* at 949. The employee had also alleged that, on one occasion, the co-worker blocked his path and told

him, "[y]ou know you look good without clothes on, (pause) I mean not in uniform." *Id.* And, the employee alleged that, several weeks later, the co-worker loudly told him, "It's not cheating if it's not in your race." *Id.* at 950. These alleged events took place over the course of less than five months. *See id.* at 949–50. The Eighth Circuit affirmed the dismissal of the employee's hostile-work-environment claim because, although the employee had alleged "behavior by a co-worker that made him uncomfortable, the behavior, even if proven, fail[ed] to show the type of extreme conduct that would entitle him to relief." *Id.* at 951–52 (first citing *Blomker v. Jewell*, 831 F.3d 1051, 1058 (8th Cir. 2016), and then citing *Anderson*, 579 F.3d at 862).

The *Meinen* court affirmed the district court's decision to dismiss for failure to state a claim. *See id.* at 951–52. If anything, the procedural posture of that case *strengthens Meinen*'s holding here, on Local 655's Motion for Summary Judgment. At the motion-to-dismiss stage, the *Meinen* court "accepted as true" all well-pleaded allegations in the complaint. *Id.* at 947. And circuit precedent required the court, on that motion to dismiss, to "grant all reasonable inferences" in the plaintiff's favor, *see Lustgraaf v. Behrens*, 619 F.3d 867, 872–73 (8th Cir. 2010). In contrast, here, at the summary-judgment stage, Myers can no longer rest on the allegations in his complain alone but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)).

In *Anderson*, the Eighth Circuit granted an employer's motion for summary judgment on a hostile-work-environment claim. In that case the employee alleged that her supervisor, on multiple occasions, rubbed the employee's shoulders or back. *Anderson*, 579 F.3d at 862. She also alleged that the supervisor called her "baby doll" during a telephone conversation, accused her of not wanting to be "one of [his] girls," suggested to her that "she should be in bed with him and a Mai Tai in Florida," and insinuated "that she could go farther in the company if she got

along with him." *Id.* Even assuming the truth of those allegations, the court concluded that, while the supervisor's conduct "was decidedly inappropriate," it did not give rise to a hostile-work-environment claim because "Title VII does not prohibit all verbal or physical harassment in the workplace and is not a general civility code for the American workplace." *Id.* at 862–63 (quoting *Herve v. Cnty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008)).

Here, the harassment that Myers describes at best matches the severity and pervasiveness (or lack thereof) of the harassment that the *Meinen* plaintiff alleged and that the *Anderson* plaintiff came forward with evidence to support. The incidents that Myers describes span a one-and-a-half-year period. *See* doc. 43 at 10–11. Although Myers describes one physical incident—when Parker allegedly put her breasts in Myers's face—the rest of the allegations amount to offensive yet sporadic comments and insults. *See id.* Even assuming Myers's version of events to be true, the Court concludes that Myers cannot obtain relief on his claim.

Myers argues that *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), redefined the severe-or-pervasive standard and lowered the bar for hostile-work-environment claims such that a shadow of doubt looms over the unfavorable hostile-work-environment precedent in the Eighth Circuit. *See* doc. 43 at 2, 9–10. But *Meinen*, decided a month after *Muldrow*, shines a bright light over this shadow and confirms that the precedents remain good law. *See United States v. Donath*, 107 F.4th 830, 837 (8th Cir. 2024) (holding that "[a]n older Supreme Court decision does not overcome the binding nature of a newer opinion filed by a three-judge panel of [the Eighth Circuit]").

Thus, the Court grants Local 655's Motion for Summary Judgment, doc. 35, on Myers's hostile-work-environment claim.

### C. Disparate-treatment claim

The last claim standing is Myers's disparate-treatment claim. *See* doc. 4 at ¶¶ 42–46. Specifically, Myers argues that his discharge resulted from discrimination on the basis of sex and sexual orientation. *See id.*

Where a plaintiff does not allege direct evidence of discrimination, the Court will analyze the claim under the *McDonnell Douglas* framework. *See Gibson v. Concrete Equip. Co., Inc.*, 960 F.3d 1057, 1062 (8th Cir. 2020). That is:

> Under this framework, a plaintiff must first establish a prima facie case of sex discrimination by showing that: (1) [he] is a member of a protected class; (2) [he] was meeting [his] employer's legitimate job expectations; (3) [he] suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated differently.

*Id.* (italics removed) (citing *Fields v. Shelter Mut. Ins.*, 520 F.3d 859, 864 (8th Cir. 2008)). "If the plaintiff succeeds, the burden shifts to the defendant to 'rebut the presumption of discrimination by articulating a legitimate, non-discriminatory reason for the adverse employment action.'" *Id.* (quoting *Fenney v. Dakota, Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003)). "If the defendant rebuts the presumption, the burden shifts back to the plaintiff to demonstrate that the proffered non-discriminatory reason is pretextual." *Id.* (citation omitted).

Here, even assuming that Myers can establish a prima facie case, he cannot establish pretext. As discussed above, Local 655 has articulated legitimate reasons for Myers's termination, *see supra* § III.A.2.b, and those reasons are just as nondiscriminatory as they are nonretaliatory, *see id.* And in light of those reasons, Myers has not shown a genuine issue of fact as to pretext.

Thus, the Court grants Local 655's Motion for Summary Judgment, doc. 35, as to Myers's disparate-treatment claim.

23

**IV.    Conclusion**

Accordingly, the Court grants Local 655's [35] Motion for Summary Judgment.   As a result, the Court necessarily denies Myers's [32] Motion for Partial Summary Judgment.  The Court denies as futile Myers's [38] Motion to Amend.  A separate judgment accompanies this Memorandum and Order.

So ordered this 24th day of March 2025.

STEPHEN R. CLARK
CHIEF UNITED STATES DISTRICT JUDGE